A. E. CRANNEY, N. W. KIMBALL, JOSEPH E. CAR-
DON, MELVIN J. BALLARD, LOUIS S. CARDON,
ROBERT MURDOCK, L. C. FARR, A. H. PALMER
and W. G. DAVIS, Respondents, v. JOHN A. McAL-
ISTER, Appellant.

No. 1959. Decided May 4, 1909 (101 Pac. 985).

1. TRUSTS—CONSTRUCTIVE TRUST—BREACH OF DUTY BY AGENT—EX-
ISTENCE OF AGENCY. Plaintiffs and defendant had bought stock
in a company to be organized to operate mining claims, on
which one W. claimed an option. Afterwards defendant dis-
covered that W's option was unenforceable because not in writ-
ing, and that other persons had a written option on the claims,
and he demanded and received the money which he had paid.
He had no authority to represent plaintiffs. The holders of the
written option had offered to give W. twelve thousand shares
in the proposed corporation in settlement of his claims if he
would give them the money he had collected from plaintiffs,
who would also be given stock, and collect an additional sum.
W. had refused the offer, and defendant contracted with him
to settle the differences between him and the option owners in
consideration of five thousand shares of the twelve thousand
W. would receive. As a result W. and the option owners contract-
ed that plaintiffs' funds held by W. and the sum returned to de-
fendant should be placed in bank until the corporation was
organized, when upon delivery of stock to the bank for defend-
ant or persons he should designate the money should go to the
corporation, and twelve thousand bonus shares should go to W.
for services in raising funds and in settlement of his claims.
The money was given to defendant and deposited in the bank.
Before the agreement was executed, defendant fully informed
plaintiffs of the entire transaction, including the twelve thou-
sand shares W. was to receive. Plaintiffs decided to take the
stock and remain in the company. Held, that defendant was not
acting as plaintiffs' agent in the transaction, but merely in ac-
cordance with his contract for settlement of the differences be-
tween W. and the option owners, and hence could not be held a
trustee of plaintiffs for the five thousand shares of stock he
received from W. (Page 562.)

2. CORPORATIONS—ORGANIZATION—ACTS OF PROMOTERS—DONATION OF
STOCK TO SETTLE CLAIMS. Promoters of a mining corporation
could give a person stock in the corporation in settlement of his
claims against the mining property sought to be developed and
as a bonus for his services in raising funds. (Page 563.)

3. CORPORATIONS—ORGANIZATION—BONUS STOCKS—EVIDENCE. Evi-- dence *held* to support a finding that bonus stock was given by promoters of a mining corporation partly in consideration of the receiver's forbearance in pressing a claim to mining property on which the promoters had an option. (Page 563.)

4. CORPORATIONS—ORGANIZATION—ACTS OF PROMOTERS—RATIFICA- TION. Where, after persons had subscribed for stock in a pro- posed mining company, it was discovered that the promoter's option on the claims was unenforceable, and a deal was made by him with the owners of another option, whereby he was to be given bonus stock in a company to be organized in settle- ment of his claim and for compensation for obtaining the sub- scriptions, and the subscribers to the other proposed company were given the option to receive back their money or take stock in the other company, and they took the stock, they rati- fied the act of the promoters in giving the bonus stock. (Page 566.)

APPEAL from District Court, First District; *Hon. W. W. Maughan,* Judge.

Action by A. E. Cranney and others against John A. McAlister. Judgment for plaintiffs and defendant appealed.

REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS.

*Moyle & Van Cott* for appellant.

*Nebeker, Hart & Nebeker* for respondents.

### RESPONDENTS' AUTHORITIES.

The facts of this case, as shown by the record, constituted appellant the constructive trustee of respondents. (Pomeroy's Equity, secs. 1044, 1049, 1052; *Sweet v. Jacocks,* 6 Paige Ch. Rep., 355; *Cushing v. Danforth,* 76 Maine 114, 4 Kent [12 Ed.], 307; *Davone v. Fanning,* 2 John Ch. Rep., 252; 1 Storey Eq. Jur., sec. 361; *Joor v. Williams,* 38 Miss. 546; *Sanford v. Sanford,* 139 U. S. 642; *Henninger v. Heald,* 29 Atl. Rep. 192; *Stiner v. Stiner,* 58 Barb. 643; *Hamilton v. Dooly, Lathrop v. Brampton,* 31 Cal. 22; *Bennell v. Diffell,* 4 De Gex, M. & G., 388; *Everart v. Searle,* 71 Pa. St. 256, 17 Am. and Eng. Enc. Law [2 Ed.],

470 and note 1 and 2; Id. 1083, note 4; *Oliver v. Platt*, 3 How. U. S. 333; *In re Hodges Estate*, 66 Vt. 76; *McLeod v. Bank*, 42 Miss. 100; *Torrey & Gilbert v. Bank*, 9 Page, 650; *Haight v. Pearson*, 11 Utah 51; *Thum v. Wolstenholme*, 21 Utah 479.)

## STATEMENT OF FACTS.

This is an action in equity and involves the title to a portion of a block of twelve thousand shares of the capital stock of the Zenoli Silver-Copper Mining Company. Judgment was entered in favor of plaintiffs, and defendant appealed. All the parties to the suit, at the time of the transactions hereinafter referred to resided at Logan, Utah, which, according to the evidence adduced at the trial, is about one hundred miles north of Salt Lake City.

The facts and circumstances leading up to and surrounding the transactions over which this action arose are about as follows: On or about November 8, 1906, Robert Murdock, one of the plaintiffs herein, met one E. H. Wilson at the Cullen Hotel at Salt Lake City. Wilson represented to him that he (Wilson) was the owner of an option to purchase certain valuable mining claims known as the Zenoli mining property, situated in the State of Nevada for the sum of $75,000, of which sum $15,000 was to be paid within a short time—a week or two—and the balance, $60,000 later on. Relying upon the representations made by Wilson, Murdock entered into an agreement with him, whereby it was understood and agreed that (quoting from Murdock's testimony), "If I could raise $5000 in Logan, we should have a one-hundredth interest for each $1000 in the Zenoli mine and the adjoining claims, and we should get interest on our money from the first car of ore that was shipped . . . and what was left should be taken . . . to pay off the balance of the $15,000 on the mine." That is, the $5000 raised by Murdock and a part of the proceeds realized from the sale of the first car of ore shipped should be used to make the first payment of the $15,000 on the property. The bal-

ance $60,000, of the purchase price, was to be raised by the sale of stock or paid out of the earnings of the company derived from the sale of ores taken from the mines. Upon the payment of the first installment of $15,000, a corporation was to be organized with a capital stock of one hundred thousand shares of the par value of $1 per share, and the corporation to succeed to the title of the option held by Wilson, take over and operate the mines therein described, and twenty-five thousand shares of the capital stock to go to Wilson in payment for the services rendered by him in procuring the option and promoting the corporation. Murdock agreed to purchase from Wilson a one-hundredth interest in the property for $1000. The next day he went to Logan and met A. E. Cranney, who is also one of the plaintiffs in the action, and called his attention to the undertaking. Within two or three days thereafter Cranney met Wilson and arranged with him for an interest in the property on the same terms and conditions that Murdock was to obtain his interest, and paid Wilson $500 on the deal. Murdock then spoke to McAlister, defendant herein, and to Jacob West, one of the plaintiffs, about the proposition, and, at their request, telephoned to Wilson, who was in Salt Lake City, and obtained his permission for McAlister and West to come into the deal, which they did to the extent of subscribing $1000. McAlister put up $750 and West $250. At the same time each of them paid Murdock $250, which was forwarded to Wilson. Ten other parties, residents of Logan, eight of whom are plaintiffs in the case, came into the deal; their subscriptions varying from $62.50 to $500 each. The total amount subscribed was $5000. Of this sum $3500 was sent to Wilson. A few days thereafter (about November 14th) some of the parties who had advanced money in the proposition telephoned Wilson and wanted to know when they could close up the deal. As a result of this conversation, McAlister, who had never seen Wilson, and knew nothing of him, or the mining property covered by his option, except what he had learned from Murdock and other plaintiffs in the case, went to Salt Lake City to see Wilson, and to personally

investigate what, if anything, Wilson was doing to close the deal with the parties from whom he obtained the option. Soon after his arrival in Salt Lake City, McAlister learned that the option held by Wilson on the Zenoli mining property was not in writing, and therefore unenforceable, and that certain parties, namely, Joseph Lippman, W. W. Wantland, and others, had obtained and then held a valid option in writing to purchase the Zenoli mining property. He thereupon went to Wilson and demanded the return of the money which he had theretofore paid for an interest in the property. He also, at the same time, demanded of Wilson the money which he (Wilson) had received from Frank Y. Thatcher and L. Y. Thatcher on the same deal. Wilson turned over to McAlister the moneys thus demanded of him, which amounted in all to $1500. The Thatchers were the only men in the deal with Wilson whom McAlister was authorized to represent on this occasion. He had no authority whatever, either express or implied, to represent any of the other parties who had put money into the undertaking.

It might be well to observe at this time that neither of the Thatchers is a party to this action, nor is the stock or interest purchased by either of them in any way involved. Shortly after the repayment of this money McAlister made inquiry of Lippman and others interested in the written option respecting the merits of the Zenoli mining property, and, from the information thus obtained, be became convinced that it was a valuable property. He was also informed that a serious controversy had arisen between Wilson and the parties who held the valid option and one Delmas, from whom both options had been obtained, and that Wilson was insisting that his oral agreement gave him some legal claim upon and against the mining property involved, and was threatening to commence and prosecute certain litigation against the owners of the written option and Delmas unless some satisfactory settlement was made. It also appears that the parties who held the written option, in order to avoid further trouble and the threatened litigation, as well as to obtain money to open

up and exploit the mines covered by the option, offered Wilson a bonus of twelve thousand shares of the capital stock in the Zenoli Silver-Copper Mining Company, which they were about to organize for the purpose of taking over and developing the Zenoli mining property, provided he would turn over to them the $3500 which he had received from the Logan people, and raise $1500 more, making in all $5000; and that when the corporation was organized capital stock should be issued to the parties contributing thereto upon the same basis on which they had contracted with Wilson for an interest in the property, namely, for each $1000 so paid they should receive a one-hundredth interest in the corporation.

Under the option held by Lippman and his associates, which included four mining claims not embraced in Wilson's oral contract, the purchase price of the property was $15,000; whereas, under the oral contract made by Wilson, the purchase price of the property was $75,000. Wilson refused to accept the proposition, and the feeling between him and the parties to the written option became very bitter. He refused to have any further dealings with them personally, and they refused to have any personal or direct dealings with him. McAlister, in his testimony, which is not disputed, stated: "I recommended their getting together and fixing it up, to which they replied (referring to Lippman and his associates), 'If you think you can get him in and do anything, you can go ahead. But,' they said, 'we won't have anything more to do with Wilson.' I told them I would go and see Wilson, and see what I could do. I went and found Wilson, and he was pretty mad, and I sat down and talked with him, and he told me his side of the case; how Delmas had been playing double; how he (Wilson) was going to bring suit against the company and get even with them. . . . I labored with him to show him the inconsistency of this; that he was simply out. . . . Mr. Wilson said, 'There is no use trying to do business with those people, and that man Delmas is there, and if I go there there will be a row. I will kill that son of a b—— if he ever says another word to me.' I then said, 'If I will fix things up, what will you do?'

He said, '. . . I will give you five thousand shares of stock when you get this thing cleared up.'" Thereupon Wilson submitted to Lippman and his associates, through McAlister, a proposition in writing, which, so far as material here, is as follows: "I hereby submit, through Mr. J. McAlister, the following proposition for a settlement of the differences existing between us and the adjustment and organization of the Zenoli Company, viz.: I will take twelve thousand shares of the stock in the company we are about to organize, understanding that the same is to be capitalized for $250,000 and with the further understanding that my friends in Logan (referring to plaintiffs and defendant) whom I have interested . . . in the proposition shall be settled with as agreed between them and myself, viz.: That they shall receive for each $1000 put in a one-hundredth interest in said company." McAlister further testified that, when this proposition was submitted to the parties to whom it was directed, Lippman answered: "That is right. That was what they had agreed to give Wilson, and that they were willing to give it" to McAlister.

Lippman testified that on this occasion he said to Mr. McAlister: "I have heard things about Wilson in the meanwhile that are very derogatory to his character, and I will have no dealings whatever with Wilson. . . . I will deal with you for him, but I will not deal with this man Wilson at all. . . . But in order to settle this matter for the best interests of the projected company, if you want to take up the matter in his behalf, I will deal with you and not with him. . . . I will give you the stock and you can act for Wilson, and you and Wilson can get together. . . . But I will have nothing to do with him." Thereupon Lippman and the other proposed directors of the Zenoli Silver-Copper Mining Company entered into a contract (November 17, 1906), whereby the funds then held by Wilson belonging to the plaintiffs and the $1500 which had theretofore been returned to McAlister were placed on deposit in Walker Bros.' Bank to be held by said bank (together with an additional $1500 which McAlister was to raise and deposit with said funds,

making in all a deposit of $5000) until the completion of the organization of the Zenoli Silver-Copper Mining Company and the issuance and delivery by it on or before December 1, 1906, of twelve thousand five hundred shares of its capital stock for J. A. McAlister or parties whom he should designate, and upon the delivery of said stock to the bank the $5000 fund should be placed to the credit of the Zenoli Silver-Copper Mining Company. It was also understood and agreed that in case the foregoing agreement should be carried out, twelve thousand shares of the capital stock should go to Wilson for the services he had rendered in raising said funds and in full settlement of all claims that he might make against the owners of the valid option and Delmas.

While this agreement was still executory and while the money was still held on deposit by Walker Bros.' Bank, and before the Zenoli Silver-Copper Mining Company was incorporated, McAlister returned to Logan and fully informed the plaintiffs in regard to the entire transaction, stating to them that he had found that the option held by Wilson on the Zenoli property was invalid, and that the deal as originally entered into with Wilson could not be carried out, and explained to plaintiffs in detail the trouble between Wilson and the promoters of the Zenoli Silver-Copper Mining property, the compromise or new agreement entered into by which Wilson was to receive twelve thousand shares of stock for services rendered by him and in settlement of his alleged claims against the property, the deposit of the money, and the terms upon which it was held by Walker Bros.' Bank. In fact, he gave a complete and detailed account of all that had transpired between him and Wilson and the other parties to the transaction, except the collateral agreement between him and Wilson, whereby Wilson was to permit him to retain five thousand of the twelve thousand shares of stock that were to go to Wilson as hereinbefore stated. As to whether McAlister advised plaintiffs of this particular transaction, there seems to be an apparent conflict in the evidence. Murdock, one of the plaintiffs, testified on this point in part as follows: "He (McAlister) came up Satur-

day (from Salt Lake City), and on Sunday (November 18th) we held a meeting at my place of business, at which Cranney, West, myself, Frank Thatcher and Frank's brother were present. At that time and place McAlister told us that · Wilson was entirely out of the deal, that he had a piece of pie, that he had made peace between Wilson and the company, that he had got the company to promise Wilson twelve thousand shares of stock, and I said to him, 'Are you getting part of that?' and I says, 'If you do, I suppose you will divide with us boys, won't you?' and he says, 'That is mine.' I asked him if he got any commission, and he said not a cent, and not a share of stock, . . . only what Wilson was going to give to him. McAlister told us this Sunday morning that our money was in Walker Bros.' Bank, and we could get it any time." Cranney also testified on this point: "McAlister advised us (plaintiffs) on November 18th that Wilson had made a settlement under which he was to get twelve thousand shares of stock." Mc-Alister testified that on this occasion he said to the plaintiffs, "Mr. Wilson has agreed to do the right thing by me when this thing is fixed up."

The foregoing testimony is not disputed. Jacob West, one of the plaintiffs in the case who was present at that meeting, was called as a witness, and in answer to the question as to whether or not he had any information of this side deal between McAlister and Wilson before he (West) received the stock subscribed by him, he said, "I so understood after receiving the stock." He was asked, "Well, I am asking you before?" To which he replied, "Well, I don't recollect before, but after receiving the stock." Counsel repeated, "Afterwards, but not before?" and the witness answered, "Afterwards, but not before." He does not, however, undertake to say that McAlister did not detail the entire transaction as testified to by Murdock. The evidence, without conflict, shows that, before the agreement was executed, and before the money on deposit at Walker Bros.' Bank was turned over to the Zenoli Silver-Copper Mining Company, several of the plaintiffs, among whom were Murdock and

Cranney, came to Salt Lake City and investigated the situation for themselves and were offered the privilege by the promoters of the company of withdrawing their money, provided they withdrew all of it. Mr. Lippman testified, and his testimony is not denied, that on this occasion he said to them, "Now, I will tell you, to be fair, if you think you are getting the worst of this proposition, if you all in Logan will take your money back and get out of this thing, I will be much obliged. . . . If you will all agree to take your money back and get out of it and quit, you can do it." Further testifying, he said, "Mr. Farr (plaintiff) said no, he didn't want to do it, and Mr. Murdock said he didn't want to do it. I said, 'I want it understood once for all. Are you satisfied?' They said, 'Yes.' I said, 'You go over with me to put this money in Walker Bros.' Bank. . . . Put up the balance of this $1500 and take your stock.' . . . So we went over to Walker Bros.' Bank, and the $1500 was put into the bank by McAlister." He further testified that Murdock, on this occasion, asked the question, "Does Wilson get the twelve thousand shares bonus?" and that he (Lippman) answered, "Yes." Murdock testified that, on this occasion, "Lippman might have told us in that conversation at that meeting that Wilson would get the twelve thousand shares on the $5000 which the Logan people had raised."

The plaintiffs, however, decided to, and did, go on with the deal and took part in the business affairs of the corporation; one of them (Murdock) becoming a director in the company. The record further shows that, at the time the stock was issued by the company, Wilson had in his possession $500 of plaintiff Cranney's money which he had failed to place on deposit with Walker Bros.' Bank, and because of this it had become necessary for McAlister to sell an additional block of stock for the company in order to make up the $5000 provided for in the contracts. After the deal had been consummated and Wilson had received, or was entitled to receive, the seven thousand shares of bonus stock retained by him, Cranney, knowing all the facts and circumstances under which Wilson obtained his stock, purchased about thirty-five hun-

dred shares from him on the basis of twenty cents per share. Cranney, in his testimony, says, "My associates (referring to the other plaintiffs) paid forty cents a share for their stock, and I got mine at the rate of twenty cents per share. I got the stock from Wilson long after the deal was consummated by McAlister, and I don't know when." Jacob West, one of the plaintiffs herein, with full knowledge of all the facts respecting the stock held by Wilson, purchased a block of it through Murdock at twenty-five cents per share, and sold it at a profit. On this point Murdock testified that he and West each bought five hundred shares of stock from Wilson, and that they paid for it at the rate of twenty-five cents per share. Furthermore, the evidence, without conflict, shows that Cranney represented and did the business for five of the other plaintiffs in this deal, but did not, so far as the record shows, permit them to share in the profits he made out of his deals in the Wilson stock. Plaintiff N. W. Kimball testified, "I left the matter pretty much in the hands of Cranney; he and I being partners. . . . I didn't go into details, but left the matter with Cranney." Louis S. Cardon, plaintiff, testified, in part, "I had nothing to do with Wilson directly. Four of us, myself, Ballard, J. E. Cardon, and J. P. Cardon (all plaintiffs) put in $250 in equal amounts on the 10th day of November, 1906. . . . I gave the check to Cranney, and was away between the time I paid the money and the time I talked with Frank Thatcher (latter part of December, 1906), and hence did not have an opportunity of learning what was going on." ·

Taking the position they do respecting the merits and equities of this controversy, the interests of Cranney, Murdock, and West seem to be adverse to those of the other plaintiffs, and it is not readily perceived on what theory they all joined as plaintiffs. Plaintiffs claim that it was some weeks after they received the stock when they first learned that Wilson had permitted McAlister to retain or to have five thousand of the twelve thousand shares of bonus stock. Plaintiffs demanded of McAlister that he account to them for the entire twelve thousand shares of such stock, including the

thirty-five hundred that plaintiff Cranney purchased from Wilson at a profit of sixty cents per share. This McAlister refused to do, whereupon plaintiffs brought this action to recover their alleged pro rata share thereof. The court gave judgment in favor of plaintiffs for a pro rata share of only five thousand shares and decreed that defendant make over and transfer such stock to them.

McCARTY, J., (after stating the facts as above.)

It is not claimed, nor does the evidence show, that the respondents, or any of them, were induced to take stock in the Zenoli Silver-Copper Mining Company (which proved to be a profitable investment for each of them) because of any misrepresentation or false statement made by McAlister. Cranney, plaintiffs' principal witness, testified, "Finally we got double what we contemplated for our money." And the trial court found, which finding is supported by the undisputed evidence, that the stock which cost Cranney only twenty cents per share, and the balance of the plaintiffs not to exceed forty cents per share, was, at the time of the trial, "of the value of eighty cents per share." The theory upon which respondents base their alleged right to recover is set forth in their printed brief as follows: "The facts in this case . . . constituted appellant the constructive trustee of respondents, . . . and that he became charged as trustee for the whole amount of the bonus stock (twelve thousand shares) and was accountable to respondents therefor, regardless of whether such stock was retained by him or delivered over to Wilson, or to anybody else." Again they say: "He had constituted himself the agent of his associates in the deal by taking their money into his possession." The respondents have not appealed from the judgment, nor have they filed an assignment of cross-errors. Therefore the only stock involved in this appeal is the block of five thousand shares of the bonus stock that was issued to appellant.

We are decidedly of the opinion that the record in this case does not uphold the contention of respondents that ap-

pellant, in his deal with Wilson and the promoters of the Zenoli Silver-Copper Mining Company acted as the agent or trustee of respondents. When appellant came to Salt Lake City and demanded the return of the money which he and the two Thatchers had paid Wilson for an interest in the property covered by the oral option which Wilson claimed to have on the property, he was not authorized to act, nor did he assume to act, for any one except himself and the Thatchers; and, when his money was returned to him, his relations with Wilson and respondents were completely severed, and there was absolutely no community of interests between them. He owed respondents no legal duty whatever to look after and protect the interests they may have acquired in their deal with Wilson, and the mere fact that appellant, after he had withdrawn his money and that of the Thatchers from the fund held by Wilson, undertook to, and did negotiate a settlement of the difference existing between Wilson and the promoters of the said mining company, did not make him the agent nor trustee of the respondents, for the record affirmatively shows that in negotiating and bringing about this settlement he neither acted nor assumed to act as the agent or trustee of respondents. He received the funds from Wilson under the contract which he had entered into with Wilson, on the one hand, and the promoters of the Zenoli Silver-Copper Mining Company, on the other, and he had no alternative but to deposit the money with the bank in accordance with the terms of the contract. In other words, appellant did not receive the money from Wilson with the understanding that it should be turned over to respondents or invested exclusively for their benefit, but, on the contrary, as we have stated, he received it for the specific purpose of depositing it with the bank under and in accordance with the terms of his contract with Wilson and the promoters of the mining Company. This is shown by the following testimony given by McAlister, which is not denied. "Q. State what, if anything, in the way of instructions, were given by Mr. Wilson as to what you should do with the $3500. A It was

simply to be turned over to these people. Q. In considera-
tion of what? A. For the settlement." Wilson, by turn-
ing this money over to appellant, did not, as respondents
seem to contend, relinquish his interest in or claim to the
fund. The record shows that, at the time that Lippman
offered to return to plaintiffs their money, provided they
would take all and draw out of the deal, Wilson went to
Lippman and said to him: "Don't you take my money out of
there. . . . The money that I put in McAlister's hands,
that stays. Don't you dare take it out. I don't want it
back."

The promoters of the Zenoli Silver-Copper Mining Com-
pany had the right to give Wilson the twelve thousand shares
of the stock, or, for that matter, any amount that they
might feel disposed to give him, in settlement of his
claims against them and as a bonus for his services in
raising the funds contributed by respondents, appellant, and
the two Thatchers. That the promoters had this right we
do not think can be successfully controverted. When Wilson,
acting through appellant, deposited the funds held by him
in Walker Bros.' Bank, and the respondents were advised
of the deposit and the terms and conditions upon which it was
made, and were given the opportunity to either ratify
what had been done and accept a specified number of shares
of the capital stock of the proposed corporation when organ-
ized, or have their money returned to them, and they there-
upon decided to take stock and stay in the deal, his (Wil-
son's) right to the bonus stock was as complete as it would
have been had he, with his own money, purchased it direct
from the company; and appellant had the same legal right
to accept a block of this stock in payment of the services
which he rendered Wilson in negotiating a settlement of
the differences existing between him (Wilson) and the Zenoli
people, as the plaintiffs had to trade and traffic in this par-
ticular block of stock. Respondents, however, claim
that the bonus stock was, in effect, purchased with
their money which, they insist, was held in trust by
appellant and Wilson, and that the alleged forbearance

of Wilson in not pressing his claims and suing the promoters of the Zenoli Silver-Copper Mining Company was not, as a matter of fact, a part of the consideration for the bonus stock and did not at all enter into the deal; but the court found that it was a part of the consideration, and the evidence, without conflict, supports the finding. The finding made by the court on this point, so far as material to the questions involved, is as follows: "That said Wantland, Lippman, Cobb, and Delmas were willing to give twelve thousand shares of stock of the Zenoli Silver-Copper Mining Company to be thereafter organized, for the purpose, first, to prevent a lawsuit by said Wilson, and, second, to obtain the said five thousand dollar fund, part of which was then in the hands of said Wilson, but that the said Wantland, Lippman, Cobb, and Delmas declined to have any dealings direct with said Wilson." The court further found: "That thereupon the defendant and said Wilson entered into an agreement between themselves that his negotiations with said Wantland, Lippman, Cobb, and Delmas would be carried on in the name of the defendant, and that bonus stock to the amount of twelve thousand shares, which they intended to obtain from the capital stock of the Zenoli Silver-Copper Mining Company, to be thereafter organized, should be divided between defendant and Wilson, by said Wilson receiving and retaining seven thousand shares of the same and the defendant receiving and retaining the other five thousand shares, and that the said Wilson and the defendant, acting in the name of defendant, entered into a contract with said Wantland, Lippman, Cobb, and Delmas, whereby it was agreed that the funds contributed as aforesaid and under the control of said Wilson would be increased by other funds to be raised by said defendant and Wilson to the aggregate amount of one thousand and five hundred dollars, and that the said five thousand dollars should be delivered to the said mining company to be organized for its use and benefit, and that said defendant should receive for said fund of $5000, twelve thousand five hundred shares of the capital stock of the said Zenoli Silver-Copper Mining Company for the con-

tributors to the fund and twelve thousand shares of the capital stock of the said company as a bonus for the said Wilson and the defendant."

The case as presented by this appeal, may be summarized as follows: Plaintiffs, under their original contract with Wilson, were to receive for each one thousand dollars paid in by them a one-hundredth interest in the mining claims upon which he claimed to have an option of purchase. The purchase price, under the Wilson option, was seventy-five thousand dollars, of which fifteen thousand dollars was to be raised within a short time. A corporation was to be organized with a capital stock of one hundred thousand shares of the par value of one dollar per share, and Wilson was to receive twenty-five thousand shares for his services in promoting the corporation. Furthermore, the record shows that Wilson was a transient, a man without means and financially irresponsible. Cranney, in explanation as to why the five hundred dollars he paid Wilson was not turned over to appellant with the balance of the fund, testified: "He (Wilson) said he had turned it over to McAllister except five hundred dollars of mine, and that, if I would let the matter stand that way, he would give me stock for it in a while. . . . To tell the truth, I believe that he had squandered the money." Whereas, under the arrangement made by Wilson through appellant with the promoters of the Zenoli Silver-Copper Mining Company, the respondents were to receive, and did receive, the same interest in the identical mining claims covered by Wilson's oral option, and, instead of paying seventy-five thousand dollars for these claims, it became necessary to pay only fifteen thousand dollars for such claims and additional mining claims, and Wilson was to receive, through appellant, twelve thousand, instead of twenty-five thousand shares of the capital stock for his services. That is, Wilson, under the last arrangement, was to receive for his services a little less than one-twentieth interest in the corporation, instead of the fourth interest provided for in his original contract with respondents.

Respondents were duly advised that Wilson was to

receive twelve thousand shares of the stock for his services and in full settlement of the interest which he claimed to have in the Zenoli property by virtue of his oral contract to purchase the same, and they thereafter ratified the entire transaction.

We are therefore of the opinion that the judgment should be, and the same is hereby, reversed, and the case is remanded to the court below, with directions to dismiss it. Costs to appellant.

STRAUP, C. J., and FRICK, J., concur.