**ST. CLAIR et al. v. UNITED STATES.**

Circuit Court of Appeals, Ninth Circuit.
November 21, 1927.

No. 5182.

**1. Criminal law ☞419, 420(12)—Admission of officer's letters charging defendant with fraud** In mail fraud case held error (Pen. Code, § 215 [18 USCA § 338]).

Admission in evidence against defendants of letters written by the secretary of state of the state to them, and to a corporation organized by them, in which their enterprise was characterized as a swindle, *held* error, in mail fraud case, under Penal Code, § 215 (18 USCA § 338).

**2. Post office ☞49(1)—An inference of fraud arising from payment by corporation of excessive commission for sale of stock is one of fact and rebuttable.**

A corporation may lawfully pay a commission for selling its capital stock, and if an apparently excessive commission is paid there may be a reasonable inference, either that the corporation is engaged in a fraudulent enterprise or that the agreement for payment of the commission was fraudulently or improvidently made, but in either case the inference is one of fact and not of law.

**3. Post office ☞49(1)—Fraud is never presumed (Pen. Code, § 215 [18 USCA § 338]).**

Fraud is never presumed, and is always a question of fact, and not of law, in prosecution under mail fraud statute (Penal Code, § 215 [18 USCA § 338]).

**4. Criminal law ☞1186(4)—Giving of instruction which takes from the jury principal issue of fact in case is prejudicial error (Jud. Code, § 269, as amended by Act Feb. 26, 1919 [28 USCA § 391]).**

Provision of Judicial Code, § 269, as amended by Act Feb. 26, 1919 (28 USCA § 391 [Comp. St. § 1246]), that judgment shall be given by an appellate court without regard to technical errors, which do not affect the substantial rights of the parties, cannot be applied to a criminal case, where an erroneous instruction virtually took from the jury the principal issue of fact.

In Error to the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Criminal prosecution by the United States against Clyde L. St. Clair and others. Judgment of conviction, and defendants bring error. Reversed and remanded.

Carkeek, McDonald, Harris & Coryell, of Seattle, Wash., for plaintiff in error Parson.

Archey B. Carter, of Portland, Or., and A. Emerson Cross, of Aberdeen, Wash., for plaintiff in error St. Clair.

A. Emerson Cross, of Aberdeen, Wash., for plaintiffs in error Epton and Lane.

E. D. Phelan, of Seattle, Wash., for plaintiff in error Blake.

Ryan & Desmond, John E. Ryan, Jr., and Thomas M. Green, Jr., all of Seattle, Wash., for plaintiff in error Koerner.

Thos. P. Revelle, U. S. Atty., and Arthur E. Simon, Asst. U. S. Atty., both of Seattle, Wash.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

RUDKIN, Circuit Judge. This is a writ of error to review a judgment of conviction under section 215 of the Penal Code (18 USCA § 338), commonly known as the mail fraud statute. The indictment charged the devising of a scheme and artifice for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, in the usual form, and the mailing of certain letters for the purpose of executing the scheme and artifice. It also contained the usual conspiracy count, but as to this the jury returned a verdict of not guilty. The facts material to a proper understanding of the errors assigned are as follows:

July 13, 1923, five of the defendants named in the indictment, by written declaration, formed what is called a common-law trust. The powers of the trustees under the declaration were broad and general, the declaration itself bearing a striking resemblance to the articles of incorporation of an ordinary business corporation. The trustees had acquired by assignment five leases from the state of Washington, covering second-class tide lands in Jefferson county, in that state, and it is to be inferred from the record that the principal or ostensible purpose of the trust was to purchase and install machinery to be used in extracting gold and other precious metals from the beach sand on the demised premises. The declaration provided that the trust estate should be divided into 250,000 beneficial interests, of the expressed par value of $1 each; such interests to be evidenced by certificates, the form of which was prescribed. The purpose for which the certificates were to be issued, or the use to be made of them, was not disclosed in the declaration, but the ostensible purpose seems to have been to raise money, through the sale of certificates, to carry on the above mining venture, in which the trustees were engaged.

On the day the declaration was executed, the trustees therein named adopted a resolution authorizing the sale of 100,000 units or shares, at the par value of $1 each, and providing that the same should be sold without any commission, and that the entire proceeds of the sales should go into the treasury of the company. On August 30, 1923, a second resolution was adopted, increasing the capitalization of the company from 250,000 to 600,000 shares, directing a sale of 300,000 shares, or units, and authorizing the president and secretary to enter into a contract with R. I. Barton, as fiscal agent, to sell the shares and to advertise in the local papers to the extent of 1,000 inches, for the purpose of acquainting the public with the project. September 5, 1923, the president and secretary entered into an agreement with Barton, as authorized by the above resolution, wherein it was agreed that Barton should receive a commission of 50 per cent. of the selling price of all shares sold, and that, where a discount not exceeding 5 per cent. was allowed on cash sales, the discount should be borne equally by the parties. September 25, 1923, the declaration of trust was amended, increasing the number of beneficial interests from 250,000 to 600,000, and reducing the number of trustees from five to three.

October 4, 1923, the Supreme Court decided that a so-called common-law trust, which had not complied with the laws relating to corporations, had no rights or status in that state, where by its declaration of trust it provided that its trustees should not be personally liable for their own acts, that its certificate holders should not be liable for the acts of the trustees, that its property should be free from the rules of tenancy in common, that it should not be dissolved by the death of a holder or trustee, and that the association had power to make by-laws, to have a common seal, to sue and be sued, and to hold lands in perpetual succession. State ex rel. Range v. Hinkle, 126 Wash. 581, 219 P. 41.

Soon after this decision was announced, and to obviate its effect, the trustees caused a corporation to be formed under the laws of the state. The trust property was then transferred to the corporation, and the corporation assumed all the obligations of the trust.

At the close of its general charge, the court instructed the jury as follows: "A scheme to take 50 per cent. or more of the purchase price of shares of the treasury stock as commission, and to turn over to the company only 50 per cent. or less of the purchase money, would be a scheme to defraud as a matter of law, unless the purpose to retain such commission was disclosed to the purchaser." This brings us to a consideration of the assignments of error.

[1] Upon the trial the government offered in evidence certain correspondence between the secretary of state of the state of Washington and the mining company and its fiscal agent. In the first of these letters, the secretary of state said:

"I note your advertising of a very questionable proposition in the state of Washington. It would appear that you are able

to swindle the people of the state of Washington, for the reason that mining stocks are exempt from the Securities Act. In order to verify your sales, permit me to suggest that you have a reputable mining engineer go over your property and report as to whether or not he can find a grain of truth or an ounce of gold in your proposition. In questioning your local salesman concerning this proposition, we have been unable to find any tangible report on the matter of obtaining gold from any beach sands in this state. I will be pleased to have a report from any one you think knows anything of this matter. I feel sure you are only inviting trouble from your method of promoting this scheme."

The mining company, through its president, replied to this letter and attached to the reply a letter or report signed by the plaintiff in error St. Clair. The second letter from the secretary of state was addressed to Barton, the fiscal agent. In this the secretary suggested that the fiscal agent be kind enough to recognize the law of the state to the extent of taking out a license as broker, and called attention to the fact that reports had come to his office that commissions in excess of 20 per cent. had been paid on the sales of mining stock. To this letter there was a reply by Barton. The third letter from the secretary of state was directed to the mining company, and called attention to the fact that commissions of from 40 to 50 per cent. had been allowed on the sales of stock, and that his office had ruled that 20 per cent. was the limit. The letter also contained a copy of a notice or advertisement which the secretary of state proposed to publish in the local papers at the place of business of the mining company. The secretary of the mining company answered this letter, and informed the secretary of state that the company had been advised by its attorney that the matters of which he was complaining were without his jurisdiction.

The purpose for which this correspondence was offered is not made entirely clear. When the offer was made, the court inquired, "Are there any admissions?" meaning, of course, any admissions on the part of the defendants. To this inquiry, counsel for the government replied, vaguely and somewhat irrelevantly, "To show knowledge, if the court please." The court thereupon admitted the correspondence in evidence, instructing the jury that they could only consider the letters of the secretary of state for the purpose of enabling them to understand the responses thereto by the defendants, and that they should not consider as true, as against the defendants, any statements contained in the letters written by the secretary of state. To the ruling of the court, an exception was allowed. Of course, if the letters written by the defendants to the secretary of state contained admissions against interest, they were entirely competent, and if the letters could not be properly understood, except in connection with the letters written by the secretary of state, the latter were also competent within the limits specified by the court.

The government does not claim, however, that the letters written by the defendants contained anything material to the case. Indeed, the letters were all self-serving and should have been ruled out as incompetent if offered by the defendants in their own behalf. Furthermore, the letters written to the secretary of state could be readily understood without any reference to the letters from the latter. In other words, we can see no possible motive for offering this correspondence, except to get before the jury the incompetent, prejudicial statements contained in letters written by a state officer, condemning the enterprise in which the defendants were engaged as a swindle. For these reasons, the letters written by the secretary of state should have been excluded, but whether the error in admitting them was prejudicial under the limitations imposed by the court we need not inquire, because the judgment must be reversed on another ground.

One Tompkins, a witness for the government, testified that he purchased 150 shares of Ruby Beach mining stock, paying $310 therefor; that he purchased the stock from various salesmen, but had purchased none from the plaintiff in error Blake; that Blake visited him at his home in Bellingham one evening in the early part of November, 1924; that he showed him through the house, and showed him, among other things, a new striped cedar chest; that the witness opened the chest, stating that he kept his papers there; that the Ruby Beach mining stock was on top of other papers; that Blake picked up the certificates and looked at them, and then replaced them; that Blake did not ask him to buy any stock, and that no one except Blake knew that the certificates were kept in the cedar chest. The wife was then called and corroborated the testimony of her husband, including the incident as to the mining stock and the cedar chest. She was then permitted to testify, over objection, that some time later a person whom she did not recognize, wearing a broad-brim, black felt hat, pulled down over the eyes, with his coat collar rolled or pulled up, appeared at her home and demanded the Ruby Beach mining stock, de-

scribing it as being in the striped cedar chest in the bedroom.

The government does not contend, of course, that it would have been competent to prove that the plaintiff in error Blake appeared at the house on the latter occasion for the purpose of committing larceny, burglary, or robbery, but it is earnestly insisted that there was sufficient testimony to show that the party who appeared and made the demand for the stock was either Blake or his representative, and that the purpose in gaining possession of the stock was to destroy or suppress testimony. This contention is far-fetched, to say the least. Tompkins did not purchase the stock from Blake, and, so far as the record discloses, had no business relations with him. On the other hand, Blake had sold Ruby Beach mining stock to a large number of persons, and there was a large amount of the stock outstanding, sold by other agents, and to say that an attempt was made to gain possession of this particular stock, with a view of suppressing or destroying testimony, a year and a half before the indictment was returned, is little short of absurd. It certainly is absurd, if we are to measure the conduct of Blake by the common standard applied to sane men of ordinary intelligence.

It may be that the testimony was not prejudicial, but testimony tending to show that Blake, or a person representing him, appeared at the home of another in the garb of a highwayman, with hat pulled down and collar turned up, would have little tendency to make a favorable impression on the jury. The testimony tending to show that Blake had anything to do with the incident is largely a matter of guesswork and speculation, and is based entirely upon the supposed fact that Blake was the only person who knew where the stock was kept, and the person who appeared at the door and demanded the stock stated that it was kept in the cedar chest. But, whatever view we may take of the sufficiency of the testimony in that regard, we think it was entirely too remote to have any bearing on the question before the court. The testimony should have been excluded, but, as already stated, whether its admission was prejudicial error we need not inquire.

One of the plaintiffs in error offered his wife as a witness in his behalf, but her testimony was excluded on the ground that she was not a competent witness. It is now conceded that this ruling was erroneous, in view of the decision of this court in Rendleman v. United States, 18 F.(2d) 27, but it is insisted that the ruling was not prejudicial, because her testimony was not material. The same ruling will not occur at a retrial, and we need not consider whether the exclusion of her testimony was error or not. For the same reason we will not pass upon or consider the sufficiency of the testimony to support the conviction as against the plaintiff in error Koerner.

[2] We will now consider the instruction given by the court to the effect that a scheme to take 50 per cent. or more of the purchase price of shares of the treasury stock as commission and to turn over to the company only 50 per cent. or less of the purchase money, would be a scheme to defraud as a matter of law, unless the purpose to retain the commission was disclosed to the purchaser.

A corporation may lawfully pay a commission for procuring subscribers to, or for selling, its capital stock. Scott v. Abbott (C. C. A.) 160 F. 573; Royal Casualty Co. v. Puller, 194 Mo. App. 588, 186 S. W. 1099; Cranney v. McAlister, 35 Utah, 550, 101 P. 985. If an apparently excessive commission is allowed, there may be room for a reasonable inference either that the corporation is engaged in a fraudulent enterprise, or that the agreement for the payment of the commission was fraudulently or improvidently made, but in either case the inference is one of fact and not of law. The stock of an established corporation, having a ready sale on the market, may be sold at a profit on a small commission, while stock of a purely speculative character, having no standing on the market, may only be sold through the greatest efforts, and upon a commission that might seem excessive. So an individual or a corporation may by force of circumstances be compelled to pay what might seem a exorbitant rate of interest, or to give what might seem a large bonus in order to raise money in a particular emergency, and yet the agreement to pay the interest or give the bonus may be prompted by honest motives and by sound business judgment. For these reasons, each case must depend on its own facts and circumstances, and the amount of the commission alone cannot be made the sole criterion of fraud.

Furthermore, the plaintiff in error Epton testified that he executed the commission agreement as president of the common-law trust; that before the agreement was entered into, he consulted the attorney for the company and submitted the agreement to him; that he was advised by the attorney that it was all right to make the agreement; that he entered into the agreement in good faith, believing at the time that it was lawful, and

that he had a right to make it; and that in executing the agreement he acted upon the advice of the attorney for the company.

St. Clair, another plaintiff in error, testified that he was the secretary and one of the trustees of the common-law trust at the time the agreement for the sale of the stock was made; that as trustee he authorized the agreement in good faith, believing that it was to the best interest of the company to make such an agreement; that the president of the company had informed him that he had submitted the agreement to the attorney for the company and that the attorney had approved it; and that in executing the agreement he acted on the advice of the attorney.

The plaintiff in error Lane testified that he was one of the trustees when the commission agreement was authorized; that before the agreement was entered into it was submitted to the attorney for the company by the president; that the attorney approved the agreement; that the witness acted in good faith as trustee in authorizing it; that they had difficulty in selling the stock in Aberdeen; that he thought the commission too high, but decided under all the circumstances that it was to the best interest of the company to make the agreement; and that in authorizing it he acted upon the advice of the attorney for the company.

[3] If this testimony was believed by the jury, it surely cannot be said as a matter of law that the agreement to pay the commission was a scheme to defraud, at least as against these particular witnesses. But, aside from this testimony, the instruction runs counter to the presumption of innocence and to the presumption that parties in their business relations are prompted by honest motives. This latter presumption is so well established that the authorities universally agree that fraud must be proved by clear and satisfactory proof, even in a civil action, and is never presumed. Walker v. Collins (C. C. A.) 59 F. 70. Possibly a criminal case might arise in which the court would be warranted in charging the jury that the defendants were guilty of fraud as a matter of law, where fraud was of the very essence of the crime charged, but no such case has been called to our attention, and no such case is presented here.

The proposition of law embodied in this instruction seems to have had its origin in a misconception as to what was decided by the Circuit Court of Appeals of the Second Circuit in Wilson v. United States, 190 F. 427. In discussing the sufficiency of the evidence to support a verdict in that case, the court said:

"The commission of 50 per cent. for the sale of United Wireless stock was most remarkable. A court may almost take judicial notice of the fact that the stock of a corporation selling for twice its par value does not require the payment of such a commission to dispose of it. If it does, the selling price must be altogether artificial. The inference must be either that the company is fraudulent, if the commission is not excessive, or that the commission is fraudulent, if the company is what it purports to be."

It seems quite apparent that the court was there discussing inferences of fact, and not inferences of law; but, if there could be any doubt on that question, that doubt was dissipated by the later decision of the same court in Brown v. United States, 298 F. 428. In the latter case, the trial court permitted counsel for the government to read the above paragraph from the Wilson Case to the jury in the cross-examination of a witness, and in reversing the judgment Judge Hough said: "That it was error to permit the reading of this opinion to the jury cannot be doubted." The reason given for the reversal was that the decision condemned in advance that which must be established, if at all, by the verdict of the jury. And if the mere reading of the paragraph to the jury on the examination of a witness during the trial was reversible error, it would clearly be reversible error to embody the same proposition of law in the final charge to the jury at the close of the trial. The language quoted from the opinion of this court in Campbell v. United States, 12 F. (2d) 873, is based on the same misconception as to what was decided in the Wilson Case, and cannot be accepted as controlling here. For these reasons, the instruction was erroneous, and was plainly prejudicial, as it took from the jury the principal issue in the case.

[4] The defendant in error contends, however, that the evidence of guilt as to the several plaintiffs in error was utterly overwhelming, and that, if any error was committed by the court, they were not prejudiced thereby. In support of this proposition, our attention is again directed to section 269 of the Judicial Code, as amended (28 USCA § 391 [Comp. St. § 1246]), which provides:

"On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

That provision is not applicable here. As

said by the Supreme Court in United States v. River Rouge Co., 269 U. S. 411, 421, 46 S. Ct. 144, 147 (70 L. Ed. 339):

"The present case is not controlled by the provision of section 269 of the Judicial Code, as amended by the Act of February 26, 1919 [28 USCA § 391; Comp. St. § 1246], that in an appellate proceeding judgment shall be given after an examination of the entire record, 'without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties.' We need not enter upon a discussion of the divergent views which have been expressed in various Circuit Courts of Appeals as to the effect of the act of 1919. It suffices to say that since the passage of this act, as well as before, an error which relates, not to merely formal or technical matters, but to the substantial rights of the parties—especially when embodied in the charge to a jury—is to be held a ground for reversal, unless it appears from the whole record that it was harmless and did not prejudice the rights of the complaining party."

Only enough of the evidence has been brought to this court to present and explain the assignments of error, so that the government has not met the burden of showing that the error was harmless or without prejudice.

For error in the instruction, the judgment of the court below is reversed, and the case remanded for a new trial.